Filed 5/22/26  P. v. Garcia CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MAURICIO ERNESTO GARCIA,<br><br>    Defendant and Appellant. | H051911<br>(Santa Clara County<br>Super. Ct. No. B1899386) |

In 2023, a jury found defendant Mauricio Ernesto Garcia guilty of multiple counts stemming from his sexual abuse of his stepdaughters, Jane Doe I[1] and Jane Doe II, on various occasions.  The trial court sentenced Garcia to an indeterminate term of 15 years to life in prison, with an additional determinate term of eight years in prison.

On appeal, Garcia claims there were numerous errors regarding his trial, including errors in admissions of evidence, abuse of discretion in denying his request for mistrial, and instructional error.  With respect to his sentence, Garcia argues that the trial court abused its discretion in imposing the upper term on one of the charged offenses and imposing certain fines and fees without first assessing Garcia's ability to pay.  Garcia finally claims that he received ineffective assistance of counsel.  The Attorney General concedes that the matter should be remanded for the trial court to assess Garcia's ability to pay ancillary fees but otherwise opposes Garcia's claims.

---

[1] As both victims share the same first initials in their names, we refer to them as Jane Doe I and Jane Doe II as designated in the second amended information filed in the underlying matter.

For the reasons explained below, we reverse the sentence and remand for resentencing. On remand, the trial court is also directed to reconsider Garcia's ability to pay in assessing fines and fees. In all other respects, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Charges*, *Trial*, *and Sentencing*

On June 14, 2023, the Santa Clara County District Attorney's Office filed a second amended information charging Garcia as follows: four counts of committing a lewd act upon Doe I, a child under the age of 14 (§ 288, subd. (a); counts 1–4); one count of committing a lewd act upon Doe II, a child under the age of 14 (§ 288, subd. (a); count 6), and one count of sexual penetration of Doe I, a child under the age of 14 and more than 10 years younger than Garcia (§ 289, subd. (j); count 5). The information further alleged that as to all counts, the victims were particularly vulnerable (§ 1170, subd. (b); Cal. Rules of Court, rule 4.421(a)(3)), and that as to counts 1 through 4 and count 6, Garcia had committed offenses against more than one victim (§ 667.61, subds. (b) & (e)).

Following a first trial, the jury could not reach an agreement on all counts, and the trial court declared a mistrial on June 24, 2023. After a second trial, on September 13, 2023, the jury found Garcia guilty on all six counts as charged, and found both enhancements true.

On March 1, 2024, the trial court sentenced Garcia to the following: (1) an indeterminate term of 15 years to life in prison on count 1 (§ 288, subd. (a)); (2) a consecutive determinate upper term of eight years in prison on count 5 (§ 289, subd. (j)); and (3) four concurrent indeterminate terms of 15 years to life in prison on counts 2, 3, 4, and 6 (§ 288, subd. (a)).

In addition, the trial court imposed a $2,000 restitution fine, an additional parole revocation fund fine of $2,000, suspended pending successful completion of parole (§§ 1202.4, subd. (b), 1202.45), a $240 court operations assessment (§ 1465.8, subd. (a)(1)), and a $180 court facilities assessment (Gov. Code, § 70373).

Garcia timely appealed.

**B.    Factual Background**

**1.  Prosecution's Case**

**a.  Jane Doe I's Testimony (counts 1–5)**

Jane Doe I, who was 20 years old at the time of trial, testified that she was born in Mexico.  While Doe I was living in Mexico, she was introduced to Garcia over the phone by her mother, who had been living in the United States since Doe I was approximately five years old; her mother indicated that Garcia was her partner.  When Doe I was approximately 12 years old and her sister, Jane Doe II, was approximately 10 years old, they moved from Mexico to Mountain View to live with Garcia and their mother.  By this time, Doe I and Doe II had already begun referring to Garcia as "Dad" and viewed him as their father.  Because their mother frequently worked nights, Garcia would often take care of both girls while their mother was working.

While living in Mexico, Doe I had been diagnosed with a heart condition that required her to check her blood pressure regularly at home.  Doe I testified that within the first year of her move to Mountain View, and while she was still 12 years old, Garcia placed three fingers in between her hip and groin area, and told her this was in order to measure her blood pressure in a different way than using a machine.  On other occasions, Garcia had Doe I take off her shirt and bra, and occasionally her pants, which he claimed would assist with her circulation; he then placed his hand on her left breast to measure her heart rate and told her that she had "good looking" breasts.

Doe I further testified that on multiple occasions while she, Doe II, and Garcia were in their apartment watching TV, Garcia rubbed her vagina and breasts over her clothes while she was laying down.  Doe I indicated that while this was initially over her clothes, Garcia later began going underneath her clothes and rubbing her vaginal area, including making comments about her pubic hair.

3

Doe I also testified that Garcia would often tuck both sisters into bed at night, which involved him lying down in between them in the middle of their bed and reading them a story. On one occasion after the girls fell asleep, Doe I began feeling a "tickle" at the top of her vagina, and was confused as to what was happening; she subsequently realized that Garcia was touching her vaginal area. Doe I stated that she was too scared to open her eyes and say anything, and was embarrassed that she could not say no to Garcia. She was also afraid to say anything to her mother because she did not want to ruin their family, and she still trusted and loved Garcia at the time.

Doe I also testified that Garcia occasionally slapped her butt if she was close to him, but only when her mother was not around. In addition, because Doe I was not allowed to lock the bathroom while showering for safety reasons (due to her health condition), Garcia would often come into the bathroom while she was showering and attempt to show her things on his phone. On one such occasion, Garcia tried to open the shower door, but Doe I held the door and did not allow him to do so; Garcia then got upset and asked her why she had held the door, stating that he would never look at her in a bad way because she was his daughter. On another occasion, Garcia put his phone on charge inside the bathroom while Doe I was showering, and told her he could not charge his phone anywhere else, and she should not move it. However, Doe I discovered that the phone camera was on and recording her, which caused her to become confused and cry. When Doe I confronted Garcia about recording her, he told her that he would never do that to her, and showed her that there was no video of her in his camera reel, but Doe I noticed that Garcia was "acting weird" and seemed nervous.

Doe I recalled one final incident, which occurred shortly before or after she turned 13, where she was lying on her stomach in her bedroom while Garcia was massaging her back. Doe I began to fall asleep, then noticed Garcia's hands slowly moving downwards on her body and underneath her underwear. Doe I then felt two of Garcia's fingers inside her vagina. Although Doe I felt like Garcia's behavior had now

4

"crossed the line" to the point that she should say something, she still did not want to tell her mother because she did not want to break up their family. However, around this time, Doe I asked her mother to be the person to check up on her if she felt sick, causing her mother to become upset. Her mother then called Garcia and asked Doe I if something else had happened with Garcia; however, Doe I still did not tell her mother about Garcia's behavior, as she did not want her mother to leave Garcia and wanted Doe II to still have a dad.

After Doe I began high school, the dynamics of her relationship with Garcia began to change. Garcia began to get upset if Doe I wanted to do any activities after school, and accused her of hanging out with boys. On one occasion, Garcia saw Doe I out with her boyfriend and became upset, telling her she was "lying" and doing "bad things." Doe I stated that Garcia's behavior and comments made her feel like a "ho."

Shortly before Doe I turned 15, she and Garcia got into an argument where he accused her and her mother of "leaving him out" by not informing him that Doe I's friends were giving her a ride home from school. Later that night, Doe I woke up at approximately 3:00 a.m. and saw Garcia standing in front of her bed watching her. Garcia then sat on the bed and told Doe I that she didn't love him and care about him, which made Doe I scared. As Doe I went to wake up her mother, Garcia continued following her and talking to her angrily. When Doe I's mother told him to stop and leave Doe I alone, Garcia began screaming and told her to leave; Doe I, Doe II, and their mother then left the family's apartment to stay with a friend. A few months after they had left, Doe I finally revealed to her mother that Garcia had touched her inappropriately in the past.

### b. *Jane Doe II's Testimony (count 6)*

Jane Doe II, who was 18 years old at the time of trial, testified that she was 10 years old when she and Doe I moved to the United States to live with their mother and Garcia. When Doe II was approximately 12 years old in the beginning of 2018, she and

5

Garcia were sitting on their living room couch watching a movie and she fell asleep. She woke up later and realized that Garcia's right hand was under her shirt and touching her breast. While Doe II initially thought she may be dreaming, she felt Garcia's hand start to squeeze her breast; Garcia then moved his hand down towards the elastic of her pants and tried to put his hand inside. When Doe II moved to get up, Garcia removed his hand, but when she told him she was going to bed, he appeared to get upset and asked her to watch another movie. While this was the first time Doe II recalled Garcia touching her inappropriately, she testified that she was worried that it may have happened previously while she was sleeping on the same couch. Doe II did not tell her sister or mother what had happened as she was embarrassed and afraid they would not believe her.

In June 2018, Doe II met with San Jose Police Detective Garcia, whom her mother arranged for her to meet under the pretext of having a medical appointment. During her interview, Detective Garcia asked her if Garcia (Doe II's stepfather) had ever touched her or acted in a way that made her feel uncomfortable, and Doe II said no because she was scared of getting Garcia in trouble, even though she was no longer living with him. Later in the same year, one of Doe II's classmates was giving a presentation at school about abuse, and made a statement that the abuse was not the victim's fault – this affected Doe II and caused her to become nervous and scared. Doe II went to the school counselor's office, where she finally spoke about the prior touching incident with Garcia. Doe II also spoke with Detective Garcia again and told him about the touching, and explained why she had felt scared to say anything in her previous interview.

### c. *School Counselor Testimony*

School counselor Josune Sullivan testified that Doe I was first referred to her in May 2018, and that during their sessions together, Doe I was very "shut down" and quiet with low energy. Sullivan further testified that on September 24, 2018, Doe II came to her office after having a panic attack in the classroom. When Doe II arrived in Sullivan's office, Doe II had shortness of breath, was very nervous and agitated, and was crying.

6

Sullivan asked her if she was fine, and Doe II responded she was not. After Doe II had calmed down, she appeared very sad and seemed to be "holding a lot;" she started talking about what had happened in the classroom. Doe II then told Sullivan that she had been molested by Garcia as a child while at home. Doe II described the incident where she had been lying on the couch, and Garcia had touched her from her breasts down. Sullivan observed that Doe II was very agitated, uncomfortable, and crying while relating the incident. Sullivan subsequently reported the information to Child Protective Services (CPS).

While Sullivan met with Doe I and Doe II together at a later date, she did not reveal to either sister what the other had previously discussed with her (Sullivan) in their sessions for confidentiality reasons. Sullivan indicated that the primary reason for her meeting with both sisters together was to work on their relationship with each other, and she did not recall indicating to either of them that similar things had happened to them involving Garcia.

### d. CSAAS evidence

Dr. Blake Carmichael testified as an expert on child sexual abuse accommodation syndrome (CSAAS). Dr. Carmichael defined CSAAS as an educational tool to assist therapists in understanding why children may or may not behave in a certain manner while they are being sexually abused or are discussing the abuse, including dispelling common myths or misconceptions therapists may have about sexual abuse. He noted that CSAAS was not used to diagnose or give an opinion on whether someone was the victim of sexual abuse.

Dr. Carmichael indicated that the primary purpose of CSAAS is to better understand why children who are victims of abuse may not act in a way that people would hope for or expect, including explaining why: (1) children do not reveal the abuse right away; (2) they may actually appear happy around their perpetrator; and (3) they may or may not be consistent in the way they discuss their trauma or sexual abuse. He also

7

explained the variety of ways that child victims experience sexual abuse and their subsequent ability to disclose, or not disclose the abuse. For example, Dr. Carmichael indicated that in most cases, the perpetrator is someone whom the child knows, has an ongoing relationship with, and may even be a caregiver who provides them with shelter and care. As a result, the perpetrator is often able to convince the child that disclosing would be negative or harmful, or forms a very close relationship with them prior to the abuse that makes them very important to the child, thus making it even harder for the child to disclose the abuse for fear of negative consequences. Dr. Carmichael also noted that for many children, there is a significant delay in disclosure, with many children choosing not to disclose the abuse until after they turn 18.

### 2. Defense's Case

Garcia testified in his own defense. He stated that he met Doe I's and Doe II's mother in 2010, and they began living together approximately six months later. They were married in 2013, and Doe I and Doe II came to live with them in 2015. Garcia indicated that over the three years that the family lived together, his relationship with the girls' mother began to change as he started to suspect she was cheating on him, leading to arguments and distance between them. They finally broke up in the spring of 2018 after she and the girls went on a ski trip with someone who Garcia believed she was cheating on him with.

Garcia described his relationship with Doe I as "formal" where they mutually respected each other, and stated that they were "fairly" close; he similarly described his relationship with Doe II as respectful. While Garcia occasionally watched the girls alone while their mother was working, this was on no more than 10 to 15 occasions, and his only conflicts with them were over the "normal" stuff such as doing their homework, going to bed, or cleaning up after themselves. Garcia denied ever lying down in the bed with both girls or touching either of them inappropriately in the manner they had described. Garcia did help with taking Doe I's blood pressure due to her medical

8

condition, but denied ever doing so with her clothes off or without a blood pressure cuff. Garcia further denied going into the bathroom while Doe I was showering or recording her.

Garcia testified that he and Doe I began having conflicts during her freshman year of high school when she began seeing her boyfriend and skipping school. On one occasion, approximately a month and a half before the girls and their mother moved out, he found Doe I with her boyfriend in a parking lot in downtown Mountain View during school hours. He took Doe I home after informing her mother. When her mother came home, she and Doe I got into an argument.

On cross-examination, Garcia confirmed that their mother had a rule that the girls could not lock the bathroom while using it. Garcia also stated that he did take on a fatherly role, embraced them as family members, and told them they could trust him.

## II. DISCUSSION[2]

### A.      *Admission of School Counselor's Testimony Regarding Doe II's Statements to Her About Abuse*

Garcia argues that the trial court abused its discretion in admitting Sullivan's testimony regarding Doe II's disclosures to her that Garcia had inappropriately touched her. Garcia claims that the fact of this disclosure itself was irrelevant to the issue of whether the alleged abuse had occurred and was more prejudicial than probative. Garcia further contends that the testimony did not properly qualify as a prior consistent statement and therefore constituted inadmissible hearsay. Garcia additionally claims that such an error violated his due process rights by rendering his trial fundamentally unfair,

---

[2] For many of his substantive claims, Garcia alternatively argues that to the extent any claims were not preserved for appeal in the trial court, he received ineffective assistance of counsel. However, based on our review of the record, we find that none of his claims were forfeited as trial counsel either objected or otherwise preserved them for appeal. We therefore will only address his substantive claims of ineffective assistance that are not based on forfeiture.

9

and was prejudicial because it is reasonably likely that but for the admission of this evidence, Garcia would have achieved a better outcome not only on count 6, which specifically concerned Doe II, but on all counts.

### 1. *Relevant Procedural Background*

Sullivan was listed by the prosecution as a witness for the second trial. Prior to trial, Garcia's trial counsel moved to exclude to the admission of any testimony that Doe I or Doe II told anyone, including Sullivan, about the alleged molestation, on the grounds that such testimony was not "fresh," as the reports were made many years after the alleged incidents took place. Counsel also objected that such evidence was inadmissible hearsay, irrelevant, and more prejudicial than probative as set forth under Evidence Code section 352. Further, counsel requested that if the testimony was to be admitted, it should be limited as required by *People v. Brown* (1993) 8 Cal.4th 746 (*Brown*), to the name of the alleged perpetrator and the general nature of the allegations, and the jury should receive a limiting instruction that the statements were not being offered for the truth of the matter asserted. The People also filed a motion in limine requesting that the trial court admit prior consistent statements by the victims pursuant to Evidence Code sections 1235, 791, and 1236.

The trial court stated that its "ruling on fresh complaint is that the testimony of the fresh complaint witness would be permitted to testify that the victim disclosed. The testimony cannot include the details of the alleged abuse, but it is limited to time, date -- the time and circumstances of the disclosure, the general nature of the disclosure; for example, that it was a sexual abuse-type of thing and who did it. And I generally tell the jury that this is not for the truth of the matter asserted but only to show that it was made at this particular time and under these circumstances." With respect to the People's motion regarding prior consistent statements, the trial court ruled that any statements needed "to be in compliance with 791 of the Evidence Code. Either after an inconsistent is made, a prior consistent statement can be produced. [¶] Obviously, I don't believe that

10

just because they testified that there's this aura of, you know, you are fabricating the testimony; therefore, you get to bring in anything. I don't think that's how it works. So if [Garcia's] going to argue that there's fabrication, if it's not implied by his cross-examination, then it—the prior inconsistent statement doesn't come."

During Sullivan's testimony regarding the statements made to her by Doe II, Garcia's counsel objected several times on hearsay, relevance, and Evidence Code section 352 grounds, and also objected that the statements did not satisfy the requirements of Evidence Code section 791. The trial court overruled the initial hearsay objections, noting that the statements Doe II made to Sullivan about who had molested her were not being offered for hearsay purposes, and instructed the jury that "this is not hearsay. You're not offering it for the truth of what she said, just that this is disclosed to this witness. It's called fresh complaint." Later during direct examination, when the People indicated the questions about the specifics of what Doe II told Sullivan fell within the prior consistent statement exception under Evidence Code section 791, the trial court overruled Garcia's counsel's hearsay objections, and instructed the jury that "this, ladies and gentlemen, is not fresh-complaint testimony. You'll get an instruction later about prior consistent and inconsistent statements. These are being offered as prior consistent statements."

At the conclusion of Sullivan's testimony, and outside the presence of the jury, Garcia's counsel summarized two conversations the parties had in chambers as follows:

"I expressed the view that as to [Doe I], Ms. Sullivan was not a fresh-complaint witness. [¶] My recollection is that the Court agreed with that view. And I think it's fair to [say] that the end result of our discussion was that the Court limited what counsel was able to elicit with respect to [Doe I]. And primarily counsel was linking up the fact of Ms. Sullivan assisting with a CPS report as to [Doe I]. [¶] We then had more extensive discussions about [Doe II] distinguishing between what was admissible as a fresh complaint and what may be admissible as a prior consistent statement. [¶] With respect

11

to the prior consistent statements—or at least that is how counsel characterized them, I objected, I think in chambers, on the record and the Court overruled those objection, and certain testimony was allowed to be presented. [¶] And I think that's why the Court allowed some level of detail on direct of Ms. Sullivan with respect to exactly what the nature of the touching was. [¶] Counsel's view, as I remember it, is that the defense opened the door to this issue by questioning [Doe II] about whether she was aware of what [Doe I] had told Ms. Sullivan. [¶] So I think the take-away here is that I was objecting to what counsel was saying under 791 with respect to fresh-complaint purposes, the Court limited it quite a bit. And with respect to [Doe I] altogether, the Court limited the testimony quite a bit [ ]."

The People generally agreed and added the following observation: "as to [Doe II], I asked to admit first the general nature of the disclosure as a fresh-complaint witness as the Court had stated previously. And argued that the additional information would come in under 791(b). … [¶] Again, with it stating that an express or implied charge had been made that [Doe II's] testimony at the hearing—was recently fabricated or influenced by bias or other improper motive and a statement was made before—a hearing is recently fabricated or is influenced by bias or other improper motive and the statement was made before the bias motive for fabrication or other improper motive is alleged to have arisen. [¶] And I was noting the questioning of [Doe II] specifically as to the fact that her first statement to officers was that there was no improper touching. After that, she met with Ms. Sullivan and disclosed to Ms. Sullivan. After that she met with Ms. Sullivan and [Doe I] at some point. And a second statement to the police was made by [Doe I][3] where she admitted to the molestation. [¶] I'll note that I don't think it's clear on the record when this meeting between Ms. Sullivan, [Doe I], and [Doe II] happened in relation to

---

[3] In light of the following sentence, we assume this was in fact a reference to Doe II.

whether it was before or after this second interview with the police by [Doe II]. But I understand that it was regardless—happening this meeting of the three of them happened after the initial disclosure of [Doe II] and after her initial statement to police officers where she denied the molestation. And so it was that timeline of offense and the basis of those questions that I brought forth to the Court the argument under 791."

The trial court concluded the discussion by stating that: "you both have, you know, summarized pretty accurately the discussions that we had. From my standpoint, I was trying to walk the line between fresh complaint and the prior consistent-statement argument. With regard to [Doe I], I think we did keep it within the fresh—or sorry. Not fresh complaint, the attempt to keep her testimony dealing with a demeanor when she discussed things with that we can say here related to allegations of abuse. [¶] We kept that separate. I think we did it by talking about what was her demeanor when she was discussing the things that were part of the CPS report. [¶] And then with regard to [Doe II], I think that one can conclude either way that the discussions that—the discussion that the witness Ms. Sullivan had with [Doe II] and [Doe I] together could have taken place before the second meeting with Detective Garcia. And that's why I let those statements come in. And I think the jury was at least instructed on the difference between fresh complaint, which is not offered for the truth, and the prior consistent statements, which may be offered for the truth—or maybe considered for their truth depending on what the jury finds."

### 2. *Applicable Law and Standard of Review*

#### a. *"Fresh Complaint" Doctrine*

The parameters of the fresh complaint doctrine were set forth in *Brown, supra,* 8 Cal.4th 746, as follows: "[P]roof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was

13

made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*Id*. at pp. 749–750.)

"[S]o long as the evidence in question is admitted for the nonhearsay purpose of establishing the circumstances under which the victim reported the offense to others, such evidence ordinarily would be relevant under generally applicable rules of evidence, and therefore admissible, so long as its probative value outweighs its prejudicial effect. (Evid. Code, § 352.)" (*Brown, supra*, 8 Cal.4th at pp. 759–760, italics omitted.) The evidence admitted should be "carefully limited to the fact that a complaint was made, and to the circumstances surrounding the making of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely upon the evidence for an impermissible hearsay purpose." (*Id*. at p. 762.)

### b. Prior Consistent Statements

Under the Evidence Code, hearsay is defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Unless the hearsay evidence falls within an exception to the hearsay rule, an out-of-court statement is inadmissible for its truth. (*Id*., subd. (b).)

Under Evidence Code section 1236, "[e]vidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." In turn, Evidence Code section 791 states: "Evidence of a statement previously made by a witness that is consistent with his [or her] testimony at the hearing is inadmissible to support his credibility unless it is offered after: (a) Evidence of a statement made by him [or her] that is inconsistent with any part of his [or her] testimony at the hearing has been admitted for the purpose of attacking his [or her] credibility, and the statement was made before the alleged inconsistent statement; or (b) An express or implied charge has been made that his [or her] testimony at the hearing is recently fabricated or is influenced by

14

bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314–1315.)

We "appl[y] the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 723.) Under this standard, we will not disturb a trial court's ruling "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

### 3. *The Trial Court Did Not Abuse Its Discretion in Admitting the Fact of Doe II's Disclosure of the Abuse to Sullivan*

Garcia argues that Doe II's disclosure of the alleged molestation to Sullivan had "no relevance" because it did not have any tendency to disprove or prove the allegations against Garcia. Garcia specifically notes that any relevance of Doe II's disclosure was "undermined" because it only took place after Detective Garcia had suggested the possibility of abuse during his initial interview with her. Garcia further claims that any nominal relevance of the disclosure was outweighed by its prejudicial nature, namely, that it would be improperly considered by the jury for hearsay purposes.

In reviewing the record, we find no abuse of discretion. The testimony that the trial court deemed as falling within the "fresh complaint" doctrine were limited to Sullivan's description of circumstances surrounding Doe II's disclosure to Sullivan of the

alleged molestation, as well as her statement that Garcia had been the perpetrator of the molestation. Accordingly, we find that the responses that the trial court deemed as admissible under the "fresh complaint" doctrine met the requirements of that doctrine as set forth under *Brown*, where "[t]he testimony was limited to the timing of [the] complaint[s] and the circumstances under which [they were] made." (*Brown, supra,* 8 Cal.4th at p. 764.)

Further, we find no merit to Garcia's contention that the fact of the disclosure was irrelevant and therefore inadmissible as substantially more prejudicial than probative under Evidence Code section 352. "Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt." (*People v. Crew* (2003) 31 Cal.4th 822, 842.) Here, we find no basis to conclude that the fact of the disclosure evoked a strong bias against Garcia with little effect on the issues. In fact, the evidence of Doe II's disclosure to Ms. Sullivan was directly relevant to the jury's determination of whether the alleged molestation did or did not occur. (See *Brown, supra*, 8 Cal.4th at p. 763.) Specifically, the circumstances under which Doe II made her disclosure were probative of such a determination, as Doe II independently disclosed the alleged molestation to a third party after being greatly affected by a classmate's presentation on abuse, even after first denying it when interviewed by Detective Garcia. Accordingly, as noted in *Brown*, the circumstances of her disclosure helped "shed light" on why Doe made the disclosures at that particular time, and were probative as to her credibility. Therefore, we find no abuse of discretion in the trial court's admission of Sullivan's testimony regarding the fact of Doe II's disclosure of the alleged molestation.

4. ***The Trial Court Did Not Abuse Its Discretion in Admitting Sullivan's Statements About Doe II's Description of the Assault as Prior Consistent Statements***

Garcia next argues that Doe II's statements to Sullivan about the specifics of the

16

alleged molestation did not meet the criteria for the prior consistent statement exception as set forth in Evidence Code section 791, subdivision (b). Garcia claims that in order to satisfy the statute, an express or implied charge of recent fabrication or bias or other improper motive must have been made, and the statement must have been made before the bias, motive for fabrication, or improper motive arose. Garcia argues that because his trial counsel did not make any charges of fabrication, bias or improper motive, Doe II's statements did not fall within the exception.

We find no merit to this contention. In reviewing the record, defense counsel's cross-examination of Doe II included a series of questions about Doe II's awareness that Garcia had also allegedly touched Doe I inappropriately, and whether either Doe I or Sullivan informed her about these allegations before she testified at trial. Defense counsel asked similar questions of Doe I during cross-examination about whether she had ever discussed the molestation with Doe II, to which Doe I responded that "[Doe II] knows, but we have never discussed what happened," and later stated that she could not remember if she was the one who told Doe II. Further, as noted by the trial court, Sullivan had been questioned by both the People and defense counsel as to whether she had ever conveyed Doe I's allegations to Doe II, or whether those allegations were discussed during the joint meeting between Sullivan, Doe I, and Doe II. Accordingly, a trial court could reasonably conclude that such questions, as a whole, reflected an implied charge of an improper motive for Doe II to fabricate the alleged molestation only after learning about Doe I's experience, particularly when Doe II had previously denied any inappropriate behavior. Therefore, because the statements Doe II made to Sullivan took place before, as defense counsel implied, she allegedly became aware that Doe I had been through something similar, we find no abuse of discretion in the trial court's finding that the statements were admissible as prior consistent statements under Evidence Code section 791, subdivision (b).

17

**B.    *Denial of Motion for Mistrial***

**1.  *Relevant Procedural Background***

During defense counsel's cross-examination of Doe I, counsel provided her with a page of prior testimony from the preliminary hearing in order to refresh her recollection. Doe I then handed it back to him, indicating that it was not hers. Counsel then suggested the parties take a short recess to give Doe I a break. As the jurors left the room, Doe I began having a visible emotional reaction, which defense counsel later described as her "sobbing loudly with her head on the witness stand and the witness advocate at her side attempting to console her." The parties then spoke in chambers about the incident, at which time defense counsel informed the trial court that he intended to move for a mistrial, but the court gave a tentative ruling denying the motion and permitted defense counsel to ask certain questions to determine the cause of this reaction. The People also spoke with Doe I during the break and confirmed with defense counsel and the trial court that Doe I "explained her reaction by saying that she thought that the transcript meant that her sister had seen Mr. Garcia abusing her, meaning [Doe I], and that that was a very upsetting thing for [Doe I] to understand." When cross-examination resumed, defense counsel elicited Doe I's testimony that he had accidentally given Doe I a page from Doe II's preliminary hearing testimony, and from reading it, Doe I became concerned that Doe II may have witnessed some of the incidents between Garcia and Doe I.

At the conclusion of Doe I's testimony, defense counsel moved for a mistrial based on his error in giving Doe I the wrong page of testimony and Doe I's strong emotional reaction, which may have been witnessed by the jury. Counsel argued that he was concerned the People would argue in their closing argument that Doe's reaction "tends to show that her testimony is credible. And I expect that the DA will say that a person who was not abused in the way that's alleged in this case would not have responded with such a fulsome and overwhelming emotional reaction." Counsel further argued that because the current scenario and Doe I's strong emotional reaction would not

18

have happened but for his error, he was "greatly concerned" that Garcia was being put in a disadvantageous position, and the only way to protect Garcia's rights would be by declaring a mistrial.

In response, the People argued that they did not see "anything" to support the mistrial motion. The People claimed that Doe I became emotional during direct examination as well, and while it was not as heightened as the specific instance at issue, it was not enough to suggest that the jury would be unable to provide Garcia with a fair trial. The People also noted that Doe I's initial response to seeing the wrong page, and returning it to defense counsel, was "deadpan." According to the People, Doe only began crying after the court announced the break, "[a]nd as jurors stood and rose up and started walking away, that's when it started becoming more. And that was after -- I would say, all the jurors had stood up. Most of them were already passed counsel's table when she was having the breathing issues or to that extent."

In making its ruling, the trial court acknowledged that Doe I's emotional reaction was "substantial, significant" and close to hyperventilating, which was different from her previous emotional responses to regular questioning. The trial court also did not agree with the People that there was no support for defense counsel's motion, and indicated it "understood why" the motion was being made. However, the trial court confirmed that following the discussion in chambers, where the parties all acknowledged that defense counsel's actions were purely by mistake, defense counsel was able to ask Doe I questions that confirmed this mistake and identified the reason for Doe I's reaction. The trial court therefore believed that any undue prejudice had been diffused by defense counsel's "damage control" questions, and denied the motion for a mistrial. However, the trial court informed defense counsel that if he felt further cross-examination was needed on the issue, he would be permitted to do so.

### 2. *Applicable Law and Standard of Review*

"To require the grant of a mistrial motion, the risk of prejudice must be incurable

19

by admonition or instruction." (*People v. Elliott* (2012) 53 Cal.4th 535, 575 (*Elliott*).) That is, "[a] trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation]. …" (*People v. Avila* (2006) 38 Cal.4th 491, 573.) "Because the trial court is generally better able than an appellate court to make this determination, a ruling denying a motion for mistrial is reviewed under the deferential abuse of discretion standard." (*Elliott*, *supra*, at p. 575; accord *People v. Valdez* (2004) 32 Cal.4th 73, 128; *People v. Montes* (2014) 58 Cal.4th 809, 884.)

### 3. *The Trial Court Did Not Abuse Its Discretion in Denying the Motion for Mistrial*

Garcia argues that trial counsel's mistake in providing Doe I with the wrong page from the preliminary hearing testimony, and her subsequent emotional reaction, irreparably damaged his ability to receive a fair trial under both the state and federal Constitution. Garcia claims that because the case "largely boiled down to a credibility contest" due to the lack of forensic evidence or third party witnesses to corroborate the allegations, Doe I's substantial emotional reaction lent "a credibility to [her] testimony that would otherwise not have existed." Garcia therefore claims he was unduly prejudiced as a result of counsel's mistake and Doe I's reaction, and the trial court therefore abused its discretion in denying the motion for a mistrial.

In reviewing the record, we find no abuse of discretion in the trial court's decision. As noted above, the trial court acknowledged that Doe I's reaction to reading the page of testimony was significant and much greater than her emotional response to questioning, yet permitted defense counsel to ask her additional questions to mitigate or explain the reason for her reaction, including confirmation that it was not the testimony in the transcript but her own concerns that Doe II may have witnessed Garcia's molestation of

Doe I.[4]  Given Garcia's concern that the jury would infer Doe I's emotional reaction was to "learning new information", Doe I's clarification that she was reacting to her own apparently unfounded concern was sufficient to cure any potential risk of prejudice to Garcia.  We do not find that such events leading to Doe I's response and subsequent clarification in front of the jury created a circumstance where Garcia's chances of receiving a fair trial were irreparably damaged.  We therefore conclude that the trial court did not abuse its discretion in denying Garcia's motion for a mistrial.

### 4. *Assuming Deficient Performance by Defense Counsel, Prejudice Has Not Been Shown*

Garcia alternatively argues that defense counsel's mistake in providing Doe I with the wrong page of testimony constituted ineffective assistance of counsel.  Garcia argues that because counsel conceded he had made a mistake, there was no reasonable strategy behind his actions, and such actions were prejudicial to Garcia because Doe I's emotional reaction lent credibility to her testimony and allegations of molestation.

The standard for evaluating claims that counsel provided constitutionally ineffective assistance is set forth in *Strickland v. Washington* (1984) 466 U.S. 668, 687–694 (*Strickland*).)  This standard provides that: "[t]o secure reversal … upon the ground of ineffective assistance of counsel under either the state or federal Constitution, [an appellant] must establish (1) that … counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that [appellant] would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 (*Cunningham*).)

It appears implicit in Garcia's argument that no reasonably competent attorney in

---

[4] In his briefing, Garcia takes no issue with these additional questions or Doe I's answers.

21

the heat of trial would inadvertently turn to the wrong page of a transcript or would have failed to exercise greater than usual caution here in anticipation of Doe I's reaction. We express no opinion on such premises and therefore assume without deciding that counsel's use of the wrong transcript constituted deficient performance. However, Garcia fails to demonstrate that counsel's mistake in showing Doe I the wrong page of testimony was prejudicial. We first note that Doe's reaction did not occur while she was testifying but took place during a break in proceedings as the jurors were leaving the courtroom, thus making it unclear if the jury actually witnessed anything. In addition, as discussed, following Doe I's significant reaction to seeing the transcript, the People learned what had caused such a response and conveyed this information to the trial court and defense counsel. In an abundance of caution (if the jury had in fact seen Doe I's reaction), defense counsel was then permitted to ask Doe I additional questions to clarify the reason for her reacting so strongly, and Garcia takes no issue with Doe I's clarification. Further, neither party mentioned Doe I's reaction during closing arguments nor otherwise spoke of it later in the proceedings, including any argument by the People that such a reaction bolstered Doe I's credibility. Beyond unsupported speculation regarding what the jury may have seen or considered from this momentary event during trial, Garcia has failed to meet his burden demonstrating that but for counsel's mistaken actions, there was a reasonable probability he would have achieved a more favorable result. We therefore do not find merit to Garcia's claim of ineffective assistance of counsel.

## C.       *Admission of CSAAS Expert Testimony*

Garcia argues that the trial court erred in allowing Dr. Carmichael to testify over his objection. First, he argues that the CSAAS testimony should have been excluded under Evidence Code section 352 as more prejudicial than probative because it improperly bolstered the victims' credibility and misled the jury on the presumption of innocence. Second, he claims that the CSAAS testimony was irrelevant and inadmissible

22

under Evidence Code section 801 because the misconceptions it seeks to correct are no longer prevalent in society and were not present among the jurors in the instant case. Third, he argues that the prosecution failed to establish Dr. Carmichael's opinions were reliable amongst the scientific community. Lastly, Garcia therefore concludes that his constitutional rights to due process were violated because the CSAAS evidence "allowed the jury to infer that, because the complainants' behavior was in some ways consistent with CSAAS, the complainants had in fact been sexually abused."

As we explain below, we conclude the trial court did not err in admitting the CSAAS testimony and reject Garcia's arguments in their entirety.

### 1. *Procedural Background*

Before trial, the defense filed a motion in limine to exclude any CSAAS evidence in its entirety. Counsel claimed that such evidence was not generally accepted in the scientific community and requested that the court hold a *Kelly/Frye*[5] hearing before admitting the evidence. Counsel also argued that such evidence was more prejudicial than probative because "its admission will create substantial danger of undue prejudice, confusion of the issues, or if it might mislead the jury." Further, counsel asked that if the court deemed the CSAAS evidence admissible to "dispel alleged myths, the court order that the testimony to dispel a myth be limited to victims as a class."

The trial court ruled that the CSAAS evidence was admissible so long as the CSAAS expert did not render an opinion on the current case as to whether the molestation occurred or not, and could not testify as to "whether or not things are true or not true or whether testimony is truthful or not truthful in regarding the specifics."

At trial, Dr. Carmichael testified as an expert in CSAAS. He testified that CSAAS was developed in the early 1980s as an educational tool for therapists to address myths

---

[5] This rule, now known as only the *Kelly* rule (see *People v. Bolden* (2002) 29 Cal.4th 515, 545 (*Bolden*)) refers to the test for admissibility of novel scientific evidence as set out in *People v. Kelly* (1976) 17 Cal.3d 24.

and misconceptions they may have about the behavior of child sexual abuse victims. There are five general categories of CSAAS: secrecy, helplessness, entrapment or accommodation, delayed, unconvincing, and conflicted disclosure, and recanting or retraction. Dr. Carmichael added that CSAAS does not serve as a "checklist" that can be used to determine if a child has been abused or not.

Dr. Carmichael explained that secrecy was foundational to understanding how a child victim perceives the sexual activity in the context of the relationship they have with the perpetrator, who is often a known or trusted person in their life. He described reasons why child victims may keep abuse a secret as a result of this pre-existing relationship, including fear that they may lose the care and shelter that person provides to them if they disclose the abuse. Helplessness refers to the "power differential" between the child and the perpetrator, which can be even greater if the perpetrator provides things to the child that they value.

Entrapment and accommodation pertain to a child's helplessness in stopping the abuse and the ways children cope or deal with the abuse. Dr. Carmichael described various behavioral, emotional, and cognitive mechanisms that children employ to cope with their situation, such as making themselves less "available" (behavioral), numbing or distancing themselves from reality as the abuse is taking place (cognitive), or appearing stoic or unaffected by the abuse (emotional). Delayed, unconvincing, and conflicted disclosure focus on belated, inconsistent, or incomplete disclosures that may not include all details. Dr. Carmichael explained how language, memory, and development may affect disclosure and stated that a child's demeanor with respect to disclosure is "incremental" and a "process". Lastly, recantation and retraction refer to the phenomenon in which a child victim discloses a valid claim of sexual abuse and then repudiates it, particularly if they experience negative consequences from their disclosure and just want "things to go away."

Dr. Carmichael clarified that a child did not have to experience all five stages of

24

CSAAS to be classified as a victim. In addition, he testified that he was not familiar with the facts of this case or any of the parties related to the case, and was not offering an opinion as to whether either victim had been sexually abused. On cross-examination, Dr. Carmichael again confirmed that CSAAS was not a diagnostic tool, and that he did not know any details about the case, including the allegations or police reports.

### 2. *Applicable Law and Standard of Review*

Expert opinion testimony is admissible when the subject matter is "beyond common experience" and the opinion would assist the trier of fact. (Evid. Code, § 801, subd. (a).) " 'When expert opinion is offered, much must be left to the trial court's discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion. [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

"Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse. [Citations.]" (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); see also *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449–450 (*Harlan*); *People v. Stark* (1989) 213 Cal.App.3d 107, 116–117.) CSAAS evidence "is admissible solely for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*People v. Bowker (*1988) 203 Cal.App.3d 385, 394 (*Bowker*).) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed

25

reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust." (*Ibid*.) CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301, fn. omitted (*McAlpin*).)

### 3. Analysis

#### a. The Trial Court Did Not Abuse Its Discretion in Admitting the CSAAS Evidence

Garcia argues that the trial court abused its discretion because CSAAS evidence allows for "circular reasoning" by depending on the assumption that abuse already occurred, thus making it more prejudicial than probative. Garcia further argues that there was no evidence presented by the People that "the lack of awareness" that CSAAS evidence had been designed to address still existed. In support of this argument, Garcia largely cites scholarly articles and cases from other jurisdictions. We find both arguments without merit.

As Garcia himself acknowledges, the California Supreme Court ruled in *McAlpin* that CSAAS testimony is admissible to disabuse jurors of commonly held misconceptions about child sexual abuse victims' behavior and to explain seemingly contradictory behavior of a child sexual abuse victim. (*McAlpin, supra*, 53 Cal.3d at pp. 1300–1302.) As this court is bound by decisions of the California Supreme Court, Garcia's references to decisions from other jurisdictions that reached different decisions on the admissibility of CSAAS testimony have no effect on the binding nature of *McAlpin*. (See *People v.*

26

*Ramirez* (2023) 98 Cal.App.5th 175, 216. ) In addition, Garcia does not cite any new studies or changes in scientific understanding that would justify our reconsidering the long line of California decisions on this subject. Based on binding precedent, as well as the substantial precedent set forth above regarding admissibility of CSAAS evidence, we find nothing in the record to demonstrate the trial court abused its discretion in ruling that the prosecution's proposed expert testimony on CSAAS was relevant and admissible for the limited purpose for which it was admitted in the instant case. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 172; *Patino*, *supra*, 26 Cal.App.4th at pp. 1744–1745; *People v. Perez* (2010) 182 Cal.App.4th 231, 245.)

Moreover, " '[t]he jury need not be *wholly* ignorant of the subject matter of the opinion' " for a trial court to reasonably conclude that Dr. Carmichael's expert testimony regarding delayed disclosure, victim demeanor, and inconsistencies in the victim's testimony would still assist the jury in dispelling any common myths about the behavior of victims, as Evidence Code section 801 contemplates. (*McAlpin, supra*, 53 Cal.3d at p. 1299, italics added.) For example, the trial court could have reasonably concluded that, in addition to the delay in both victims' disclosures of the alleged molestation, Doe II's initial denial of any inappropriate behavior during her interview with Detective Garcia before she ultimately disclosed the molestation to Sullivan was the type of seemingly self-impeaching behavior for which the Supreme Court has recognized that CSAAS evidence may be helpful. Therefore, we find no merit to Garcia's contention that the CSAAS evidence did not meet the requirements of Evidence Code section 801 of being "beyond common experience."

Further, we reject Garcia's contentions that the trial court abused its discretion by failing to exclude Dr. Carmichael's testimony as substantially more prejudicial than probative pursuant to Evidence Code section 352. "Evidence only creates 'undue prejudice' if the evidence tends to evoke an emotional bias against the defendant, and the evidence has relatively little importance based on the specific issues involved in the

particular case. [Citation.]" (*Lapenias, supra*, 67 Cal.App.5th at p. 174.) In the instant case, the possible prejudicial impact of the CSAAS testimony, none of which was related to the facts of the charged case, was slight in comparison to the charged conduct which involved two different child victims. Further, the trial court appropriately limited the scope of the CSAAS testimony. Specifically, the trial court indicated that the CSAAS evidence was admissible so long as the CSAAS expert did not render an opinion on the current case as to whether the molestation occurred or not, and the expert could not testify as to "whether or not things are true or not true or whether testimony is truthful or not truthful in regarding the specifics." We find no indication that such a decision was arbitrary or capricious and therefore conclude that the trial court did not abuse its discretion in admitting Dr. Carmichael's testimony.

### b. CSAAS Evidence is Not Subject to the Kelly Rule

Garcia next argues that because CSAAS evidence has never been evaluated by the *Kelly* rule and its model has not been generally accepted in the scientific community, the trial court abused its discretion in admitting the CSAAS testimony. We disagree.

Under the *Kelly* rule, "evidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test. The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community." [6] (*Bolden*, *supra*, 29 Cal.4th at p. 544.)

The California Supreme Court has explained that the "additional scrutiny" under *Kelly*, which "imposes certain preconditions on the admission of evidence derived from a novel scientific technique or procedure." " ' is justified because "[l]ay jurors tend to give

___

[6] Although the *Kelly* rule involves two more prongs regarding the qualifications of the testifying witness and the procedure used to perform the technique at issue (see *Bolden, supra,* 29 Cal.4th at pp. 244–245), Garcia does not contend that Dr. Carmichael's testimony failed to satisfy these other two elements. Therefore, we do not discuss them further.

considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials.  We have acknowledged the existence of a '. . . misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.' " ' " (*People v. Peterson* (2020) 10 Cal.5th 409, 457 (*Peterson*).)

However, unlike evidence that is based on a new scientific technique or procedure, expert *opinion* testimony is not necessarily subject to the *Kelly* test.  The California Supreme Court has explained as follows: "[I]n most cases no similar caution is required before a jury considers expert opinion testimony.  Unlike results 'produced by a machine,' to which jurors may 'ascribe an inordinately high degree of certainty,' jurors presented with the personal opinion of a witness, even an expert witness, 'may temper their acceptance of his [or her] testimony with a healthy skepticism born of their knowledge that all human beings are fallible.'  [Citations.]  For this reason, ' "[*a*]bsent *some special feature which effectively blindsides the jury, expert opinion testimony is not subject to Kelly*[].'' '  [Citations.]  Of course, some expert testimony may be 'based, in whole or part, on a technique, process, or theory which is new to science and, even more so, the law' [citation]; where the novel technique 'appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury,' additional scrutiny under *Kelly* is warranted." (*Peterson*, *supra*, 10 Cal.5th at pp. 457–458, some italics added.)

In the instant matter, Garcia contends that the California Supreme Court applied *Kelly* to evidence regarding rape trauma syndrome in *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*), and therefore, *Kelly* must be applied to CSAAS evidence as well.  In *Bledsoe*, "expert testimony describing the [rape trauma] syndrome and applying it to [the] victim was used to prove that 'a rape in the legal sense had, in fact, occurred.' " (*People v. Stoll* (1989) 49 Cal.3d 1136, 1160 (*Stoll*), italics omitted.)  However, "rape trauma syndrome was not devised to determine … whether, in fact, a rape in the legal sense occurred—but rather was developed by professional rape counselors as a therapeutic tool,

29

to help identify, predict and treat emotional problems experienced by the counselors' clients or patients." (*Bledsoe*, *supra*, at pp. 249–250.) In other words, the scientific literature regarding rape trauma syndrome did "not … purport to claim that the syndrome is a scientifically reliable means of proving that a rape occurred." (*Id.* at p. 251.) The court therefore found that the evidence was inadmissible as it did not meet the *Kelly* test. (*Stoll, supra,* at p. 1161.)

The Third District Court of Appeal subsequently indicated in *Bowker*, *supra*, 203 Cal.App.3d at page 394, that *Bledsoe* created an exception allowing for the admissibility of evidence related to rape trauma syndrome only for the limited purpose of " '[disabusing] the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths.' [Citation.]" (*Bowker*, *supra,* at p. 391.) The court also found that notwithstanding *Kelly*, CSAAS evidence may similarly be admissible for the limited purpose of "disabusing the jury of misconceptions as to how child victims react to abuse." (*Bowker,* at p. 392.)

The California Supreme Court later made clear that its opinion in "*Bledsoe* did not hold that the [*Kelly*] test applied to the expert opinion in that case" and that *Bledsoe* did not "discuss the test's relationship to 'syndrome' or other expert psychological evidence in general." (*Stoll, supra,* 49 Cal.3d at p. 1161.) Significantly, subsequent to *Bledsoe*, the California Supreme Court in *Stoll* concluded that where psychological testimony is based on methods that "are *not* new to psychology or the law" and "carry no misleading aura of scientific infallibility," the testimony is not subject to the *Kelly* rule. (*Stoll*, *supra*, at p. 1157.) Notably, Garcia does not address *Stoll* in his argument.

In the present case, Garcia fails to demonstrate that CSAAS evidence is based on methods that are "new to psychology or the law" and that testimony about CSAAS carries a "misleading aura of scientific infallibility." (*Stoll*, *supra*, 49 Cal.3d at p. 1157; accord, *Peterson*, *supra*, 10 Cal.5th at p. 458.) Indeed, the case of *People v. Munch* (2020) 52 Cal.App.5th 464 (*Munch*), specifically found that with respect to CSAAS

30

evidence, "we are not dealing with new experimental scientific evidence ' "not previously accepted in court." ' " (*Munch,* at p. 472.)

In the instant case, Dr. Carmichael had been a licensed psychologist for 22 years and was a supervisor and evaluation program manager at the U.C. Davis Care Center, a child abuse treatment program. Over the course of his work at the Center, he had personally treated over 180 children for sexual abuse, evaluated over 300 children for abuse, and supervised and trained others their treatment of children in "the better part of 800 to 1,000 cases." His expert testimony was therefore " 'based on [his] clinical experience with child sexual abuse victims and on [his . . .] … familiarity with professional literature in the area.' [Citation.] … Such expert testimony meets 'traditional standards for competent expert opinion, without need for additional screening procedures' " under *Kelly.* (*Munch*, *supra*, 52 Cal.App.5th at p. 473.) In addition, CSAAS evidence "has been ruled to be properly admitted by the courts of this state for decades." (*Id*. at pp. 468, 472.)

In addition, testimony about CSAAS does not purport to make any definitive statements about whether a child has been abused and instead simply attempts to dispel misconceptions about the conduct of child sexual abuse victims. (See *Munch*, *supra*, 52 Cal.App.5th at pp. 468, 473; *Lapenias*, *supra*, 67 Cal.App.5th at p. 173.) Dr. Carmichael specifically testified that he knew nothing about the case or the facts, and did not know anyone related to the case. The California Supreme Court has also rejected the notion that the "use of 'syndrome' … terminology by a mental health professional makes the [testimony] seem 'scientific' to a jury, and thus invokes [*Kelly*]." (*Stoll*, *supra*, 49 Cal.3d at p. 1161, fn. 22 [court was "not persuaded that juries are incapable of evaluating properly presented references to psychological … 'syndromes' "].)

Finally, due to Garcia's failure to demonstrate the applicability of the *Kelly* rule to the CSAAS evidence in this case, we find unpersuasive his reliance on out-of-state authority regarding whether CSAAS evidence meets a *Kelly* (or *Frye*) requirement

regarding general acceptance within the scientific community. (See, e.g., *State v. J.L.G.* (N.J. 2018) 234 N.J. 265, 301 ["we apply the *Frye* test and consider whether CSAAS has achieved general acceptance in the scientific community"].)

In conclusion, because Garcia does not establish that CSAAS evidence is based on methods that are "new to psychology or the law" and that the evidence carried a "misleading aura of scientific infallibility" (see *Stoll*, *supra*, 49 Cal.3d at p. 1157; accord, *Peterson*, *supra*, 10 Cal.5th at pp. 457–458), we find that the trial court did not abuse its discretion in admitting expert testimony about CSAAS without first conducting a *Kelly* test. (See, e.g., *Lapenias*, *supra*, 67 Cal.App.5th at p. 173 ["expert CSAAS testimony is not ' " 'scientific' " evidence' subject to the *Kell*y rule"]; *Munch*, *supra*, 52 Cal.App.5th at pp. 472–473 [CSAAS evidence not subject to *Kelly* analysis]; *Harlan*, *supra*, 222 Cal.App.3d at p. 449 [*Kelly* rule does not apply to expert testimony about the reactions of child molestation victims, where expert's "opinion was based on her clinical experience with child sexual abuse victims and on her familiarity with professional literature in the area"].)

### c. *Admission of CSAAS Evidence Did Not Violate Due Process*

Finally, Garcia contends that the admission of the CSAAS evidence violated his due process rights to a fair trial because it was irrelevant, unreliable, and allowed the jury to the jury to infer because Doe I and Doe II's behavior was "in some ways consistent with CSAAS," they had in fact been sexually abused.

Generally, a court's compliance with the rules of evidence does not violate a defendant's right to due process. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 174, citing *People v. Hall* (1986) 41 Cal.3d 826, 834–835.) Reviewing courts have also routinely held the admission of CSAAS evidence does not violate due process. (See, e.g., *Patino*, *supra*, 26 Cal.App.4th at pp. 1744–1745 [trial court's admission of CSAAS evidence did not violate due process].) For the same reasons, we conclude that Dr. Carmichael's

testimony about CSAAS did not violate Garcia's constitutional right to due process.

Further, we have already rejected Garcia's contentions that (1) the evidence should have been excluded as irrelevant; (2) the trial court abused its discretion in admitting such evidence pursuant to sections 352 and 801; and (3) CSAAS evidence is unreliable and that the *Kelly* test must be applied. The "rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised" on appeal. (*People v. Scott* (2011) 52 Cal.4th 452, 487, fn. 29.) Having rejected each of the underlying claims of error in admitting the CSAAS evidence, we accordingly reject Garcia's due process claim.

## D.     *Instructional Error*

Garcia next argues that the court erred in instructing the jury with CALCRIM No. 1193 and erred in refusing defense counsel's request to modify the instruction by removing the final phrase. Garcia specifically argues that CALCRIM 1193 is defective because it "allows the jury to find that because a complaining witness's conduct after the fact was consistent with having been sexually abused, the complaining witness is more believable." He therefore claims that the trial court's use of CALCRIM 1193, and the resulting confusion to the jury, reduced the prosecution's burden to prove the charges beyond a reasonable doubt, which prejudicially violated his right to due process and a fair trial.

### 1.  *Trial Court Proceedings*

When the trial court denied Garcia's motion in limine to exclude CSAAS testimony, it indicated that it would instruct the jury with CALCRIM No. 1193 before the testimony. Accordingly, before Dr. Carmichael's testimony, the court instructed the jury as follows: "Child Sexual Abuse Accommodation Syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the Accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. [¶] The evidence said from Dr. Carmichael is not evidence

33

that the defendant committed any of the crimes charged against him or any crime – never mind. [¶] You may consider the evidence only in deciding whether or not [Doe I's] and [Doe II's] conduct was—was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of the alleged victims."

At the conclusion of evidence, prior to instructing the jury and outside the jury's presence, the trial court reviewed the jury instructions with both counsel. At that time, defense counsel asked that language from an older version of CALCRIM No. 1193, which used the phrase "not inconsistent with" instead of "consistent with," be used, which the People agreed with. Defense counsel also requested that the final phrase of the instruction, "and in evaluating the believability of their testimony," be stricken on the grounds that it was an inappropriate application of CSAAS testimony and "invite[d] the jurors to judge the testimony of the complaining witnesses by a different standard than other witnesses." The People objected to the request, arguing that "the entire point of that [phrase] is to understand whether or not how [the victims] acted that can be deemed credible." The trial court did not remove the phrase, finding that the alleged conduct involved circumstantial evidence relating to credibility, and there had been questions asked regarding the alleged victims' prior inconsistent statements. As these subjects were discussed as part of CSAAS, the trial court concluded that the CSAAS testimony could be used to evaluate the believability of the alleged victims' testimony.

At the conclusion of evidence, the court instructed the jury pursuant to CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Blake Carmichael regarding [CSAAS]. [¶] [CSAAS] relates to a pattern of behavior that may be present in child sexual abuse cases. The testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. [¶] Dr. Carmichael's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [Jane Doe I and Jane Doe I]'s conduct was not inconsistent with the conduct of

34

someone who has been molested, and in evaluating the believability of their testimony."

### 2. *Applicable Law and Standard of Review*

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) We consider the instructions as a whole and " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*Ibid.*)

### 3. *No Error in Instructing with CALCRIM No. 1193*

In making his argument, Garcia notes that while California courts have upheld instructions that included the same sentence from CALCRIM 1193 that he now challenges (see *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzales*); *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176; *Munch*, *supra*, 52 Cal.App.5th at pp. 473–474), such precedent was incorrectly decided because the instruction impermissibly bolsters credibility and allows a reasonable juror to conclude from the expert's testimony that the alleged victim was sexually abused. Garcia therefore argues that usage of the CSAAS evidence to evaluate believability exceeds the permissible scope of CSAAS testimony as set forth in *McAlpin, supra,* 53 Cal.3d 1289.

In reviewing the instruction in light of the entire record, we are not convinced that the jurors understood the instruction as permitting the use of Dr. Carmichael's testimony for the improper purpose of proving that Garcia molested either victim. As Garcia himself acknowledges, multiple courts have rejected similar challenges to the final phrase of the instruction, and Garcia provides no basis for us to conclude those cases were wrongly decided. Moreover, assuming without deciding that reference to believability as a distinct purpose in the last sentence of the instruction may create some ambiguity, we

consider it unlikely that the jury here would have applied the instruction in an impermissible manner. (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) Dr. Carmichael stated both on direct and cross-examination he was not rendering an opinion on whether the alleged molestation had actually taken place. The jurors were also instructed that they were the sole judge of a witness's credibility and were not required to accept an expert's opinion as true. The prosecutor also did not argue improper inferences from Dr. Carmichael's testimony. In fact, the People's argument reiterated that CSAAS was a tool to better understand the behavior of child sexual abuse victims as follows: "A CSAAS expert -- it provides you two things generally. It helps you understand why children who suffer from this type of trauma may act in ways that might seem unexpected and assists in evaluating the believability of their testimony. [¶] I want you to remember, Dr. Carmichael knows nothing of this [case]. He has been told nothing of this case. He is not here to tell you what happened or who to believe. Right? He is limited, limited to this to assist you. Right? To dispel those -- understand for us -- are there myths that needed to be dispelled? Right? Myths of -- would somebody disclose immediately? Right? Would a child remember everything? Would they be overly emotional? Would they want to report? Would they want to protect their abuser? Would they disclose all these details at once. These type of myths." The People went on to discuss ways to assess Doe I's and Doe II's credibility by looking at other factors separate from the CSAAS testimony.

Finally, CALCRIM No. 1193 expressly informed the jurors that Dr. Carmichael's testimony could not be considered as evidence that Garcia "committed any of the crimes charged against him." Therefore, the instruction, which the trial court gave to the jury both before *and* after Dr. Carmichael's testimony, explicitly precluded the use of that testimony to infer from Doe I's and Doe II's conduct that Garcia committed the charged crimes. Accordingly, we conclude that Garcia's claim that the trial court erred in failing to modify CALCRIM No. 1193 pursuant to his request is without merit. (*Gonzales*,

*supra*, 16 Cal.App.5th at pp. 503–504 [rejecting contention that CALCRIM No. 1193 allows a jury to use CSAAS testimony as proof that the victim was molested]; accord, *Munch*, *supra*, 52 Cal.App.5th at pp. 473–474; *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176.) Further, because we find that it is not reasonably likely that jurors understood the instruction as permitting the use of CSAAS evidence for the improper purpose of proving that Garcia molested either victim, we also reject Garcia's claim that the instruction impermissibly lowered the prosecutor's burden of proof.

### E. *Refusal to Give Pinpoint Instruction*

#### 1. *Relevant Procedural Background*

Towards the conclusion of trial, defense counsel asked the trial court to provide the jury with the following pinpoint instruction: "Evidence of Uncharged Sexual Offenses [¶] In a criminal action in which the defendant is accused of a sexual offense, the law permits the prosecution to present evidence of the defendant's commission of an uncharged sexual offense or offenses. If the prosecution has not presented evidence of the commission of an uncharged sexual offense, you may conclude the defendant has not committed a prior sexual offense. You may, but are not required to, consider the absence of a prior sexual offense in deciding whether the prosecution has proved the allegations in this case beyond a reasonable doubt. [¶] Evidence Code section 1108(a)."

When the parties discussed instructions with the trial court, defense counsel argued that the pinpoint instruction stemmed from "basic principles of fairness and due process." Counsel contended that because the People are usually allowed to present evidence of other uncharged sexual offenses to argue that the charges are true, the defense should equally be able to argue that the lack of evidence of uncharged sexual offenses is something that the jury should be allowed to consider in deciding whether the charges are true. Counsel described the instruction as an "image" of the concept embodied in Evidence Code section 1108. In response, the People argued that there was no case law to support this type of pinpoint instruction, and the instruction went "completely against the

37

understanding that the jury is to only consider the evidence that is before them and presented in trial. [Defense counsel] is trying to create is an instruction for the jury to consider what is outside of trial, what has not been presented as evidence. … [¶] If a district attorney decides not to put in certain acts because the victim is unavailable or they don't want the victim to have to come in to testify, albeit whatever the restrictions or obligations are, then it is inviting the jury to evaluate the potential lack of evidence based on the district attorney's choice without even understanding if it is out there. It goes against CALCRIM 300 stating that neither side is required to call all witnesses or provide all evidence in a case. … [¶] I'm concerned that this would only invite the jury to speculate and not abide by the court rules of merely making a determination based on the evidence, the law, and their own common sense."

The trial court denied the requested instruction, noting that "I don't think it serves any purpose for me to go into reasons, additional reasons as to why this would be my ruling, but that is my ruling."

### 2. *Applicable Law and Standard of Review*

A defendant "has a right to an instruction that pinpoints the theory of the defense." (*People v. Mincey* (1992) 2 Cal.4th 408, 437, italics omitted.) The trial court may, however, "properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*People v. Moon* (2005) 37 Cal.4th 1, 30.)

We apply the de novo standard of review when determining whether the trial court erred in refusing to give a requested pinpoint instruction. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.)

### 3. *The Trial Court Did Not Err in Denying the Requested Pinpoint Instruction*

Garcia argues that the court erred in denying his trial counsel's request for a pinpoint instruction because he was entitled to point out the failure to call logical witnesses. Garcia claims that the pinpoint instruction "sought only to inform the jury of

[the] ability of the prosecutor to present Evidence Code section 1108 evidence" so that trial counsel would be able to comment on the failure to present any such evidence. Garcia therefore argues that it was "patently unfair" for the People to have the ability to present such evidence but the defense to be prohibited from commenting on the People's failure to do so. Garcia further claims that the failure to give the instruction violated his due process rights for an opportunity to present a meaningful defense, and constituted prejudicial error requiring reversal.

Evidence Code section 1108 provides, in relevant part, that: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (§ 1108, subd. (a).)

In reviewing the pinpoint instruction proposed by defense counsel, we cannot conclude that it constitutes a proper statement of the law. While Evidence Code section 1108 permits introduction of uncharged sexual offenses, there is no corresponding statute, nor any case law cited by Garcia, supporting his claim that *lack* of such evidence may be considered in determining his guilt. Indeed, Garcia does not provide any case law supporting his claim that such an instruction—which highlights the lack of evidence presented on a certain topic—has been found permissible when the People chose not to present certain evidence. Further, as correctly noted by the Attorney General, the requested pinpoint instruction would conflict with the instruction in CALCRIM No. 300, which was given to the jury, indicating that neither side is required to call all witnesses or produce all evidence that might be relevant. Moreover, we find no merit to Garcia's claim that the refusal to give the pinpoint instruction somehow prohibited his counsel from commenting on the People's alleged failure to call logical witnesses, as counsel still retained the ability to make such an argument as it related to the elements of the offenses charged.

39

In conclusion, we find no error in the trial court's denial of Garcia's requested pinpoint instruction.

## F. *Ineffective Assistance of Counsel for Failing to Call Character Witnesses*

Garcia claims that he received ineffective assistance of counsel based on counsel's failure to call three character witnesses who had testified on his behalf at the first trial. Garcia argues that because the focus of the trial was witness credibility, counsel's decision not to call the witnesses that could vouch for him constituted deficient performance because it allowed the jury to dismiss his testimony as self-serving, and therefore convict him. Garcia further contends that such deficient performance was prejudicial to him because his previous trial had ended in a hung jury, while the second trial resulted in a conviction, thus reflecting a reasonable probability that he may not have been convicted if the witnesses testified.

### 1. *Relevant Procedural Background*

During the first jury trial, the defense called three of Garcia's relatives as character witnesses. Garcia's nephew, G.A.[7], testified that he had been around Garcia regularly while Doe I and Doe II were present, and never observed Garcia touching them inappropriately or acting in a way that would cause concern; he also never observed the girls acting uncomfortable around Garcia. Garcia's sister, M.G., testified that she met Garcia, Doe I and Doe II on multiple occasions, and thought Garcia was an "exemplary man" who took care of the girls like a father. M.G. never observed Garcia acting or touching Doe I or Doe II inappropriately, and never observed him acting inappropriately around her own daughter. Lastly, Garcia's sister-in-law, A.G., testified that she had a close relationship with Garcia and had been around him in the presence of children, including Doe I and Doe II and her own daughters, and never observed him touching Doe

---

[7] We refer to the character witnesses by their initials only to protect their personal privacy interests pursuant to California Rules of Court, rule 8.90(b)(10), (11).

I and Doe II in an inappropriate way, acting in a manner that would cause her concern, or saw either girl act uncomfortable around him. A.G. also never observed Garcia acting inappropriately around her daughters or any other children, and indicated that if she had any concerns about him molesting them, her children would not be allowed around him.

Prior to the second trial and during the parties' discussions of their motions in limine, defense counsel indicated that he did not plan to call any character witnesses, including the relatives who had previously testified, and noted that "the first jury didn't like it."

### 2. *Applicable Law and Standard of Review*

As discussed above, the standard for evaluating claims that counsel provided constitutionally ineffective assistance is set forth in *Strickland, supra*, 466 U.S. at pp. 687–694*,* and provides that: "[t]o secure reversal … upon the ground of ineffective assistance of counsel under either the state or federal Constitution, [an appellant] must establish (1) that … counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that [appellant] would have obtained a more favorable result absent counsel's shortcomings." (*Cunningham, supra*, 25 Cal.4th at p. 1003 ) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

It is the appellant's burden to demonstrate by a preponderance of the evidence that his or her counsel's performance fell below an objective standard of reasonableness. (See *In re Thomas* (2006) 37 Cal.4th 1249, 1257.) "Unless [an appellant] establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of

professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.)

"To sustain a claim of inadequate representation by reason of failure to call a witness, there must be a showing from which it can be determined whether the testimony of the alleged additional defense witness was material, necessary, or admissible, or that defense counsel did not exercise proper judgment in failing to call him [or her]. [Citation.]" (*People v. Hill* (1969) 70 Cal.2d 678, 690–691.) "Although '… the choice of which, and how many, of potential witnesses [to call at trial] is precisely the type of choice which should not be subject to review by an appellate court,' [citation] trial counsel must accept the burden of *investigating* the facts surrounding criminal charges sufficient to make an *informed* decision. While '… we cannot presume prejudice from the mere fact of counsel's alleged inaction,' [citation] reversal is compelled where appellant can demonstrate he was denied an adjudication on potentially meritorious issues due to counsel's inadequate preparation. [Citation.]" (*People v. Bess* (1984) 153 Cal.App.3d 1053, 1060.)

### 3. *Analysis*

As to deficient performance, Garcia's primary contention is that because the previous trial, where the witnesses testified, resulted in a hung jury, there was no rational basis for counsel's decision not to call them in the instant trial to bolster his defense. However, defense counsel specifically explained why he chose not to call them in the instant trial, namely, that the first jury "didn't like that." Such a statement suggests that counsel may have reasonably concluded that the evidence of Garcia's good character at the first trial was weakened by the close familial relationship between the witnesses and Garcia. In addition, such witnesses are always subject to cross-examination, and counsel could have reasonably determined that any benefits in calling these witnesses were outweighed by the risks inherent in calling lay witnesses who could only provide limited

42

testimony on behalf of Garcia. Accordingly, we find that Garcia has not met his burden of proof demonstrating there was no rational tactical purpose behind defense counsel's decision to not call the three character witnesses in the second trial.

Similarly, with regard to prejudice, as the Attorney General correctly notes, there were other differences in the testimony between the two trials, apart from the character witness testimony, that could have reasonably impacted the jury's final decision in each trial. For example, in the first trial, the alleged victims' mother testified for the People, and her testimony demonstrated a possibility that Doe II may have overheard Doe I disclosing some of the alleged molestation incidents to their mother. Defense counsel emphasized this point during his closing argument in claiming that Doe II's allegations were false and unreliable. Further, Sullivan did not testify in the first trial about Doe II's disclosure of the alleged molestation to her, which may have resulted in some of the jury agreeing with defense counsel's arguments about Doe II's credibility and the subsequent hung jury result. We therefore conclude that Garcia fails to affirmatively demonstrate that but for defense counsel's failure to call the character witnesses, he would have achieved a more favorable result.

In conclusion, we find no merit to Garcia's claim of ineffective assistance of counsel.

## G. Cumulative Error

Garcia argues that even if any errors identified in this case were individually harmless, the cumulative prejudicial effect of all the errors rendered the trial so fundamentally unfair as to deny his right to due process. "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) Here, we have found no errors, and where we assumed error, we also found no prejudice. Consequently, we reject Garcia's cumulative error argument.

43

### H. Imposition of Upper Term Sentence on Count 5

Garcia argues that the trial court abused its discretion in imposing an upper term sentence on count 5. Garcia claims that the trial court mistakenly stated that all of the aggravating factors supporting imposition of the upper term had been found true by the jury, when only one such factor had been found true. While the Attorney General agrees that not all of the aggravating factors had been found true, the Attorney General contends the error was harmless beyond a reasonable doubt.

#### 1. Relevant Procedural Background

At Garcia's sentencing hearing on February 28, 2024, the court made the following comments with respect to its sentence:

"Additional allegations and aggravators of more than one victim, taking advantage of a position of trust, that the crimes involved sophistication and planning, and the victims were particularly vulnerable, were all found to be true by the jury. The Court did note that the defendant has no other criminal history, which is a factor in mitigation. [¶] … [¶] The nature and circumstances of Count 5 is involving penetration, and the fact that the defendant committed the act against a second victim, took advantage of a position of trust, used sophistication and planning, and perpetrated the offenses against a particularly vulnerable victim, justifies imposition of the upper term for Count 5, in my opinion." The trial court therefore imposed the upper term of eight years on count 5 (§ 289, subd. (j)).

#### 2. Applicable Law and Standard of Review

Section 1170, subdivision (b)(2) states that when imposing a sentence under a statute that allows for a low, middle, and high term, the court shall impose the middle term unless "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

44

"A Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established.  The violation is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements.  If the reviewing court cannot so determine, applying the *Chapman*[8] standard of review, the defendant is entitled to a remand for resentencing."  (*People v. Lynch* (2024)16 Cal.5th 730, 768 (*Lynch*).)

3. ***The Trial Court Erred in Stating that All of the Aggravating Factors Had Been Found True by A Jury, Thus Requiring Reversal***

Garcia contends, and the Attorney General concedes, that the trial court erroneously stated that all of the aggravating factors had been found true by the jury.  Our review of the record confirms that this was indeed error, as the only aggravating factor alleged, and found true by the jury, with respect to count 5 was that the victims were particularly vulnerable.  Although the jury did find the multiple victim allegation true, it was as to the counts for lewd and lascivious conduct only.  Accordingly, the aggravating factors that the crimes involved sophistication and planning (Cal. Rules of Court, rule 4.421(a)(8)) and taking advantage of a position of trust (Cal. Rules of Court, rule 4.421(a)(11)) were not found true by the jury, and therefore were unproven.

The Attorney General argues that such an error was harmless because the jury would have found both factors true beyond a reasonable doubt, based on the testimony presented at trial.  The Attorney General contends that Doe I's testimony demonstrated she loved and trusted Garcia, and considered him to be a father figure in her life who took care of her; he therefore took advantage of this position of trust by digitally penetrating

---

[8] See *Chapman v. California* (1967) 386 U.S. 18.

her after putting her to bed.  The Attorney General similarly argues that the testimony indicated Garcia waited until the victims' mother had left, and he was alone with Doe I, to engage in the offense, thus demonstrating advance planning.

While we would tend to agree that the testimony established Garcia took advantage of a position of trust, we cannot make the same conclusion regarding the degree of sophistication and planning.  As cautioned by the California Supreme Court in *Lynch*, " ' "[t]o the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." ' " (*Lynch, supra,* 16 Cal.5th at p. 775.)  We find that to be applicable here, as the determination of whether the crime involved sophistication and planning rests on a vague and subjective standard.  Accordingly, we cannot conclude beyond a reasonable doubt that the jury would have found true the two remaining aggravating factors upon which the court relied to conclude the upper term was justified.  We therefore reverse the sentence on count 5 and remand for the trial court to hold a new sentencing hearing during which it shall only consider aggravating factors that were found true by the jury as part of its analysis of whether to impose an upper term sentence.

## I.      *Imposition of Restitution Fine*

Garcia finally claims that the trial court abused its discretion in imposing a $20,000 restitution fine and additional court fees without first assessing his ability to those fees, despite his request at sentencing that the court stay such fines and fees based on his inability to pay.  In initial briefing, the Attorney General opposed the request.

After the parties submitted their initial briefing, the California Supreme Court issued its decision in *People v. Kopp* (2025) 19 Cal.5th 1 (*Kopp*).  The decision in *Kopp* held, among other things, that: (1) where a trial court imposes fines exceeding the statutory minimum of $300 under section 1202.4, subdivision (b), and section 1202.45, it

must consider the defendant's ability to pay; and (2) before imposing ancillary costs pursuant to section 1465.8, subdivision (a)(1) and Government Code section 70373, equal protection principles require the trial court to, on defendant's request, consider a defendant's inability to pay such costs. (*Kopp*, *supra*, 19 Cal.5th at p. 30.) We therefore requested supplemental briefing from the parties on whether the matter should be remanded to address fines and fees in light of *Kopp*. In their supplemental briefing letters, both parties agreed that remand was appropriate to address Garcia's ability to pay the ancillary costs, but differed as to whether the court should readdress the restitution fine on remand.

As we are remanding for resentencing on count 5, we also direct the court to reassess the restitution fines and ancillary fees in accordance with the holding in *Kopp*. We express no opinion on whether Garcia is entitled to a reduction in fines and fees.

### III.   DISPOSITION

Garcia's sentence is vacated, and the matter is remanded for resentencing. On remand, the trial court may also determine the applicable fines and fees based on Garcia's ability to pay, as set forth in *Kopp, supra,* 19 Cal.5th 1, and if necessary, reduce the fines in accordance with the governing statutes. In all other respects, the judgment is affirmed.

_____

                    Wilson, J.


WE CONCUR:




_____
        Grover, Acting P. J.




_____
        Lie, J.




*People v. Garcia*
H051911